FLORENCE T. NAKAKUNI #2286
United States Attorney
District of Hawaii

JOHN A. MICHELICH
Senior Litigation Counsel
Criminal Division, Fraud Section
United States Department of Justice
E-mail: john.michelich@usdoj.gov

MARC A. WALLENSTEIN
Room 6-100, PJKK Federal Bldg.
300 Ala Moana Boulevard
Honolulu, HI 96850
Telephone: (808) 541-2850
Facsimile: (808) 541-2958
E-mail: marc.wallenstein@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 14-00010 CRB |
| | ) | |
| Plaintiff, | ) | GOVERNMENT'S TRIAL BRIEF; |
| | ) | EXHIBIT A; CERTIFICATE OF |
| vs. | ) | SERVICE |
| | ) | |
| JENNIFER ANN MCTIGUE,     (01) | ) | TRIAL:  JULY 13, 2015 |
| | ) | TIME:    9:00 A.M. |
| Defendant. | ) | JUDGE:  CHARLES R. BREYER |
| | ) | |

## GOVERNMENT'S TRIAL BRIEF

### I.   INTRODUCTION

The United States submits this Trial Brief to assist the Court in understanding the factual background of the case, as well as evidentiary and other legal issues that may arise during trial.

Defendant Jennifer A. McTigue is charged in a 45-count indictment with:

- One (1) count of Conspiracy to Commit Wire Fraud and Mail Fraud in violation of 18 U.S.C. § 371 [Count 1]

- One (1) count of Conspiracy to Launder Monetary Instruments Derived from Unlawful Activity in violation of 18 U.S.C. § 1956(h) [Count 2]

- Twenty (20) counts of Wire Fraud in violation of 18 U.S.C. § 1343 [Counts 3-23]

- Five (5) counts of Mail Fraud in violation of 18 U.S.C. § 1341 [Counts 24-29]

- Five (5) counts of Money Laundering in violation of 18 U.S.C. § 1957 [Counts 30-45]

The charges relate to a mortgage fraud scheme beginning in or about February 2011 involving a series of real estate transactions.  McTigue's two co-defendants, Marc Melton and Sakara Blackwell, have both pleaded guilty and agreed to cooperate with the government. The transactions involve seven condominiums in Hawaii: three on Oahu, and four on the Big Island.

Each transaction followed the same basic pattern, with relatively minor differences from one transaction to the next.  During the period of the charged

2

scheme, McTigue, Melton, and Blackwell fraudulently released real estate

mortgages encumbering properties in Hawaii for the purpose of marketing and

selling the properties at full market value to innocent purchasers mortgage-free.

McTigue, Melton, and Blackwell first obtained title to a distressed property,

or identified a distressed property with cooperative owners.  McTigue and/or

Melton delivered fraudulent documents by U.S. mail to the financial institutions

holding mortgage liens against the properties.  The mailed materials purported to

authorize McTigue and/or Melton to release the mortgage, via documents

identified by Melton and/or McTigue at various times as a "Note Tender

Agreement" (NTA), EFT Tender Agreement, or "Mortgage Satisfaction

Agreement" (MSA).  The EFT Tender Agreement, NTA and/or MSA falsely

represented that a valid "negotiable instrument" or promissory note had been sent

to the lender in the approximate amount of the outstanding mortgage liens.  The

documents contained language stating that, in the event the bank holding the

mortgage failed to acknowledge and respond to the conditions in the "agreement"

within a specified period of time (usually three days), Melton and/or McTigue, or

others, would become authorized to act as representatives of the financial

institutions holding the mortgage, and the bank would acquiesce to them

performing acts on behalf of the lender, including the right to "execute and record

a satisfaction of Lien for mortgages."  No lending institution receiving these

materials ever actually agreed to permit Melton or McTigue to act as that institution's agent for purposes of releasing the mortgage or mortgages encumbering the relevant property.

Once no response was received from the lending institution, McTigue and/or Melton created and filed with the Hawaii Bureau of Conveyances a false and fraudulent "Satisfaction of Mortgage" document, purporting to be from the lending institutions holding the mortgage(s).  These Satisfaction of Mortgage documents were signed by Melton, who falsely represented himself to be a bank official, such as Vice-President, or the bank's "authorized representative."  Melton's signature— above a line stating that Melton was a lending institution official or representative—was notarized.  The false Satisfaction of Mortgage documents appeared on their face to be genuine.  Once filed with the Hawaii Bureau of Conveyances, the false Satisfaction of Mortgage document showed that the outstanding mortgage(s) encumbering the property had been satisfied, meaning that they had been discharged, even though they had not.  Because the Bureau of Conveyances is the official public record for recordation of all interests affecting real estate in Hawaii, the public record then officially (and falsely) reflected the properties to be mortgage-free.

Following the filing of the false Satisfaction of Mortgage documents with the Bureau of Conveyances, McTigue and Blackwell then marketed and sold the

properties.  They ultimately conveyed title to innocent, good faith purchasers via a warranty deed that represented the properties to be free and clear of encumbrances. Because the mortgage liens were shown as "satisfied" on the public record with the Bureau of Conveyances, title searches did not show any outstanding, unpaid mortgages, and the buyers were not aware of any unpaid mortgages.  Hence, escrow officers closing the sale transactions did not pay the outstanding mortgage balances, because they were unaware of them, or thought they had been paid in full.

McTigue, Melton, and Blackwell materially omitted from disclosure to buyers of real estate that they had applied this process purportedly to release existing mortgages on properties.  As a result, McTigue and Melton took a portion of the net proceeds from the sale of the properties, which was then divided amongst them through a series of wire transfers.  Blackwell received net proceeds according to her own interest in two of the condominiums, as well as commissions from acting as a real estate agent on the transactions.

Count One charges the defendants with conspiracy to commit mail fraud and wire fraud in connection with the foregoing scheme, which involved seven different condominium transactions in Hawaii following the above pattern.  Count Two charges the defendants with money laundering conspiracy, with reference to the financial transactions involving the proceeds of the fraud.  The indictment

charges 21 wire fraud counts, each of which relates to a single email message or interstate wire transfer to or from Hawaii arising from the above scheme, as set forth in a chart on pages 24-27 of the indictment.  The indictment charges six mail fraud counts, each of which relates to the mailing of the false and fraudulent document(s) to the banks that purported to satisfy the mortgages, as set forth in a chart on pages 29-31 of the indictment.

Finally, defendants are charged with 16 substantive counts of money laundering, based on financial transactions involving the proceeds of the scheme to defraud.  The United States also seeks forfeiture of property derived from the scheme to defraud, specifically, certain bank accounts, safety deposit boxes, and insurance policies that contain those proceeds.

## II.   CURRENT WITNESS LIST

The government's current list of trial witnesses is as follows:

| | |
|---|---|
| Asino, | Donna |
| Baron, | Nick |
| Batterson, | Tishia |
| Betz, | Brenda |
| Blackwell, | Sakara |
| Blackwell, | Hilton |
| Bragg, | Frank |
| Choi, | Nicole |
| Chrun, | Rene |
| Dang, | Cherie |
| DeCenso, | Kristy |
| Dodson, | Kai |
| Dodson, | Darcie |
| Fangon, | Joseph |

| | |
|---|---|
| Fleig, | Kaley |
| Foisy, | Pierre |
| Fryjoff, | Cindy |
| Fryjoff, | Cindy |
| Golden, | Lotus |
| Green, | Clay |
| Harper, | Mark |
| Jendryka, | Jacob |
| Jenkens, | Lanisa |
| Kaster, | Cheryl |
| Kiakona, | Kapono |
| Kim, | Peter |
| Leach, | Keely |
| Lee, | Timothy |
| Lefebvre, | Isabelle |
| Marques, | Susana |
| Marr, | Kimberly |
| Martellotto, | Anthony |
| McCourt, | Brian |
| McGuire, | Laree |
| Melton, | Marc |
| Morgan, | Kristy |
| Narciso, | Sunya |
| Neumann, | Serena |
| Nishida, | Kazuko |
| Nohara, | Aryn |
| Otsuka, | Laurice |
| Papageorge, | Destina |
| Riney, | Karen |
| Rurak, | Lisa |
| Rurak, | Mark |
| Rush, | April |
| Sakaguchi, | Bianca |
| Schaumleffel, | Rex |
| Seneczko, | John |
| Sloan, | Rick |
| Stuard, | Regina |
| Takashi, | Scott |
| Thompson, | Nicki |
| Tongg, | Rustan |

Trueblood,   Jeremy
Wells,        Marshall
Yananaka,    Tracy

## III.   MATTERS ALREADY RESOLVED IN PRETRIAL LITIGATION

The Court has resolved a number of issues during pretrial litigation, properly

narrowing the issues in the case.  Ms. McTigue filed two pretrial motions raising

overlapping issues, all of which the Court denied.  The government briefly

summarizes her arguments and the Court's conclusions of law, and respectfully

requests that the Court prohibit Ms. McTigue from re-litigating these settled issues

during trial.

The government has attached the Court's Order denying these motions as

Exhibit A to this Trial Brief.

### A. Defendant McTigue is Competent

On November 24, 2014, following a competency evaluation, the Court found

defendant McTigue competent to stand trial.

### B. The Court Denied Defendant McTigue's Omnibus Motion to Dismiss for Lack of Jurisdiction [Dkt. No. 69]

Defendant McTigue filed a 36-page Motion and "irrelevant documents and

exhibits," such as her birth certificate, records from the Columbia Historical

Society, and the Lieber Code, in support of her argument that she is not subject to

the jurisdiction of this Court.  She argued that she is not a "person" before the law;

that her name is trademarked; and that the indictment is "fictitious" because the

military overthrow of the Kingdom of Hawaii was unlawful, and because the

Grand Jury foreman signed the back of the indictment rather than the front.  The

Court properly rejected these arguments and denied defendant's Motion to

Dismiss, concluding that the Court has jurisdiction over Ms. McTigue.  *See*

Exhibit A, Order, *United States v. McTigue*, No. 14 Cr. 00010 (Dec. 10, 2014)

[Dkt. No. 99].

### C. The Court Denied Defendant McTigue's Omnibus Motion to Suppress Evidence [Dkt. No. 68]

Defendant McTigue filed a motion to suppress Evidence, raising similar

issues regarding the validity of the indictment, and also challenging the procedures

used by the government to obtain her electronic communications.  The Court

concluded that there were no defects in the process used by the government to

indict McTigue, or the process by which the government used a search warrant to

obtain electronic communications.  *See* Exhibit A, Order, *United States v.

McTigue*, No. 14 Cr. 00010 (Dec. 10, 2014) [Dkt. No. 99].

### D. McTigue Failed to File Any Supplemental Motion Regarding the Search Warrant

At a status conference on May 12, 2015, Ms. McTigue orally renewed her

unsuccessful motion to suppress by challenging the validity of the search warrant

in this case.  The Court ordered Ms. McTigue to file a written motion setting forth

her challenge to the search warrant on or before the close of business on May 26,

2015, with the motion to be argued at a status conference on June 9, 2015, so that the motion could be heard and resolved in an orderly fashion far enough in advance of trial to avoid delay.  Ms. McTigue failed to file any motion, and no challenge to the search warrant made at the status conference on June 9.

The government respectfully requests that the Court deny any future motions, oral or written, that Ms. McTigue may make challenging the validity of the search warrant.  Ms. McTigue lost her prior challenge to the search warrant, then failed to meet the filing deadline to file a supplemental motion challenging the search warrant.  She has provided no justification for doing so.  Entertaining any motion challenging the search warrant at this late stage, or in the midst of trial, would undermine valid narrowing effect that trial deadlines have on the issues in the case, and would dis-serve judicial economy.

## IV.  JENNIFER MCTIGUE WILL ACT AS HER OWN DEFENSE COUNSEL.

A defendant in a criminal prosecution has a Sixth Amendment right to waive appointed counsel and to proceed *pro se*.  *Faretta v. California*, 422 U.S. 806 (1975).  In this case, the Court already has satisfied itself that the defendant knowingly and intelligently waived her right to appointed counsel.  *Id.,* at 835.  At a hearing on May 12, 2015, the Court engaged in a colloquy with Ms. McTigue to ensure that she understands fully the decision to proceed *pro se*.  The Court entered its findings that Ms. McTigue knowingly waived her right to counsel, that she

understands the consequences of self-representation, and that nevertheless she has

elected to represent herself.  (Doc. 134)  The Court's colloquy clearly comported

with the Ninth Circuit's directive that the Court's inquiry be sufficient to "[assist]

in establishing on review that the waiver was knowing and intelligent." *United*

*States v. Akins*, 243 F.3d 1199, 1203 (9th Cir. 2001), *amended by* 276 F.3d 1141,

1146 (9th Cir. 2002); *United States v. Farhad*, 190 F.3d 1097, 1100 (9th Cir.1999).

Moreover, the Court assured itself that Ms. McTigue understood "the dangers and

disadvantages of self-representation, so that the record will establish that [she]

knows what [she] is doing." *Faretta*, 422 U.S at 835; *Iowa v. Tovar*, 541 U.S. 77,

89 (2004).

The Court has appointed Ms. Lynn Panagakos to act as standby counsel to

assist Ms. McTigue at trial. *Faretta*, 422 U.S. at 834, n.46.  The appointment of

standby counsel does not violate the defendant's Sixth Amendment right to

represent herself, even where the appointment is made over a defendant's

objection. *McKaskle v. Wiggins*, 465 U.S. 168, 178 (1984).  Appointment of

standby counsel is, however, within the court's discretion, as there is no

constitutional right to such appointment. *United States v. Bova*, 350 F.3d 224, 226

(1st Cir. 2003); *Tate v. Wood*, 963 F.2d 20, 26 (2d Cir. 1992).

The defendant may use the advice of standby counsel as she desires, but

standby counsel cannot be allowed to take over the defendant's case.  The Sixth

Amendment requires that the defendant be allowed to control the organization and

content of her defense. *McKaskle*, 465 U.S. at 178.  There is, however, no absolute

bar on standby counsel's unsolicited participation in the presentation of

defendant's case before the jury.  Standby counsel may properly assist the

defendant before the jury in completing tasks the defendant clearly wishes to

complete, such as introducing evidence and objecting to testimony.  Standby

counsel may also help ensure the defendant's compliance with the basic rules of

courtroom protocol and procedure.  However, standby counsel's participation may

not be so intrusive as to destroy the jury's perception that the defendant is

representing herself.  *Id.*  Standby counsel is also permitted to participate in the

presentation of defendant's case outside the presence of a jury.  The defendant

herself must be allowed to address the judge freely on her own behalf, and disputes

between standby counsel and the defendant must be resolved in the defendant's

favor in matters that are normally left to the discretion of counsel. *Id.*

When a defendant proceeds *pro se*, the court's role is not altered, and no

new obligations are imposed on the trial judge. *United States v. Trapnell,* 512 F.2d

10, 12 (9th Cir. 1975).  A litigant who represents herself does so with no greater

rights than a litigant represented by a lawyer, and the trial court is under no

obligation to become an advocate for the defendant or to assist and guide her.

*United States v. Pinkey*, 548 F.2d 305, 311 (10th Cir. 1977); *Birl v. Estelle*, 660

F.2d 592 (5th Cir. 1981); *United States v. Merrill*, 746 F.2d 458, 465 (9th Cir. 1984).

## V.   ANTICIPATED EVIDENTIARY ISSUES

### A. No Motions *in Limine*

Neither party has filed any pre-trial motions *in limine*.

### B. Evidence "Inextricably Intertwined" With The Charged Scheme

#### 1.   *Evidence That McTigue Underreported or Failed to Report Income that Derived From the Scheme to Defraud*

Defendant McTigue failed to report as income on her 2011 federal tax return the proceeds she derived from her mortgage fraud scheme, and failed to file a return in 2012.  The United States has notified her that it will present this tax return evidence as proof of her intent to defraud.

While such evidence generally is not admissible to prove the character of a person in order to show action in conformity therewith, *see* Fed. R. Evid. 404(b), the government is not offering this evidence under Rule 404(b).  Rather, the uncharged conduct is "inextricably intertwined" with defendant's execution of the ongoing scheme that is charged in the indictment.  It is well-settled in the Ninth Circuit that Rule 404(b) does not exclude evidence of uncharged conduct that is inextricably intertwined with the charged offenses.  *United States v. Sayakhom*, 186 F.3d 928, 938 (9th Cir. 1999).  "Evidence should not be treated as 'other crimes' evidence 'when the evidence concerning the [other] act and the evidence

concerning the crime charged are inextricably intertwined.'"  *United States v.*

*Soliman*, 813 F.2d 277, 279 (9th Cir. 1987) (citing *United States v. Aleman*, 592

F.2d 881, 885 (5th Cir. 1979)); *see also United States v. Ripinsky*, 129 F.3d 518,

1440 (9th Cir. 1997) (9th Cir. 1997) (uncharged crimes were "direct evidence of

the ongoing conspiracy charged in the indictment"); *United States v. Vizcarra-*

*Martinez*, 66 F.3d 1006, 1012 (9th Cir. 1995) ("[W]hen it is clear that particular

acts of the defendant are part of, and thus inextricably intertwined with, a single

criminal transaction," admission of evidence of those acts does not violate

Rule 404(b)).

Numerous courts have reviewed the admissibility of evidence of the

non-reporting of criminally-derived income from fraud schemes.  Such evidence is

admissible because it is intrinsic, direct evidence of the scheme to defraud.  *See,*

*e.g.*, *United States v. Epstein*, 426 F.3d 431 (1st Cir. 2005) (defendant's tax return

intertwined with offense because tax return reports the income that he received

from the fraudulent scheme); *United States v. Johnson*, 262 F.R.D. 410, 415

(D. Del. 2009) (tax return evidence intrinsic where unreported income is a fruit of

the charged fraudulent scheme).  In *United States v. Lesniewski*, 11-cr-01091, Dkt.

No. 462, 2013 U.S. Dist. LEXIS 101336, at *21 (S.D.N.Y. July 12, 2013), *aff'd,*

*United States v. Rutigliano*, 2015 U.S. App. LEXIS 10425 (2d Cir. N.Y. June 22,

2015) (unpublished), the district court found tax return evidence "inextricably

intertwined" with the charged disability fraud case, reasoning that the defendant's "failure to disclose or his decision to underreport income helps complete the store of [the] charges." *Id.* at *7.

Here, the funds that McTigue derived from the scheme to defraud flowed to McTigue as substantial income, which she then underreported or failed to report, as income. McTigue's choice in how, or whether, she reported fraudulently-obtained proceeds from her criminal activity assists in completing the story of the scheme.

2.    *Evidence of Two Uncharged Real Estate Transactions*

In addition, the government will offer evidence that the defendant McTigue applied her fraudulent scheme to release mortgages on at least two additional parcels of real estate not charged as specific counts in the indictment, as follows: (1) a condominium purportedly owned by Donna Lynch, located at 1177 Queen St., Apt. 3505, Honolulu, HI 96814 (Ko'olani 3505); and (2) a house purportedly owned by co-defendant Sakara Blackwell, located at 1102 Alewa Drive, Honolulu, HI 96817. The fraudulent release of existing mortgages on these two properties, though not charged in the indictment, was part of defendant's scheme and constitutes evidence of her intent to defraud. For all the reasons discussed above, such evidence is inextricably intertwined with the charged scheme to defraud.

### C. Expert Witness Testimony

Pursuant to Rules 702, 703 and/or 705 of the Federal Rules of Evidence, the government intends to introduce the testimony of one expert witness, FBI Special Agent Ariel Miller.  Mr. Miller is a computer forensics examiner, who will testify about the FBI's recovery of documents from certain electronic media, and the FBI's seizure of certain documents from Google.  Mr. Miller will authenticate the documents by describing the processes the FBI took to obtain and preserve the documents.  Special Agent Miller's testimony will assist the jury and the Court in understanding the evidence and determining facts in issue.

### D. Co-Conspirator Statements

Pursuant to Rule 801(d)(2)(E) of the Federal Rules of Evidence, *Bourjaily v. United States*, 483 U.S. 171 (1987), and *United States v. Kearn*, 61 F.3d 1422, 1425 (9th Cir. 1995), the government intends to introduce the oral and written statements of Sakara Blackwell and Marc Melton, two co-conspirators of McTigue, during the course of and in furtherance of the common objectives of the conspiracy and scheme to defraud alleged in Counts 1 and 2 of the indictment. The government will introduce these statements through both live witness testimony and written correspondence, such as e-mail messages.

### E. Electronic Evidence

#### 1. Authentication

The foundational "requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). Rule 901(a) only requires the government to make a *prima facie* showing of authenticity or identification "so that a reasonable juror could find in favor of authenticity or identification." Once the threshold showing has been met to admit the document, any questions concerning the genuineness of the item normally go to the weight of the evidence.

Through a number of established means, electronic evidence will be authenticated in this case, as noted below:

#### a.      By Certificate of Authenticity

The Federal Rules of Evidence authorize a party to authenticate certain documents for the purposes of using them at trial via a written Certificate of Authenticity. *See* Fed. R. Evid. 902(11). The documents qualify for a hearsay exception if authenticated via Fed. R. Evid. 902(11).

The government provided defendant McTigue with notice that it intends to rely on Certificates of Authenticity to authenticate certain documents in this case obtained from banks and other custodians. The government provided defendant McTigue with the Certificates of Authenticity, as well as the Bates number ranges

for the documents authenticated by each Certificate, all of which had been previously produced in discovery.

b.     By Testimony from an Agent

FBI Special Agent Arial Miller, a computer forensics expert experienced in the process used to obtain the e-mails and other documents, will authenticate exhibits in this case through testimony concerning the process he used to obtain the computer records from the seized computer hard drives and from the production of records by Google. *See, e.g., United States v. Whitaker*, 127 F.3d 595, 601 (7th Cir. 1997) (in conspiracy to distribute marijuana case, a computer seized from one defendant's residence contained computer records of drug transactions and the drug business; rejecting argument that government was required to supply a witness with personal knowledge of the computer system; agent testimony authenticated the computer printouts under Rule 901(a) including that the computer was seized during the execution of a warrant, the agent was present when the computer records were retrieved from the computer using the Microsoft Money program, and the agent testified concerning his personal knowledge and his personal participation in obtaining the printouts).

c.     By Distinctive Characteristics

Under Fed. R. Evid. 901(b)(4), authentication may be made by distinctive characteristics, which may include appearance, contents, substance, internal

18

patterns, or other distinctive characteristics, taken in conjunction with circumstances.  Courts have relied upon this rule in admitting e-mail communications bearing distinctive characteristics.  For example, this may include the e-mail addresses used in the communications, the context and circumstances, and other surrounding circumstances.  *See, e.g.*, *United States v. Siddiqui*, 235 F.3d 1318, 1322 (11th Cir. 2000) (in fraud, false statements, and obstruction case, e-mail authenticated by contents and context, including e-mail address, automatic reply to sender, the messages indicated knowledge of matter, and use of nicknames; and foreign deposition testimony concerning phone conversations after e-mail messages were transmitted, applying Rule 901(b)(4)); *United States v. Safavian*, 435 F.Supp.2d 36, 40 (D.D.C. 2006) (e-mails between defendant government official and lobbyist were authenticated by distinctive characteristics under Rule 901(b)(4) including the e-mail addresses used which bore the sender's and recipient's names; the name of the sender or recipient in the bodies of the e-mail, in the signature blocks at the end of the e-mail, in the < To: > and < From: > headings, by signature of the sender; and by the contents).

d.    By Comparison

Under Fed. R. Evid. 901(b)(3), authentication may be made by either the trier of fact or an expert.  Under this rule, the jury, as the trier of fact, may compare authenticated specimens with the evidence sought for admission.  Some courts

have used this rule to authenticate e-mails.  *See, e.g.*, *United States v. Safavian*, 435

F. Supp. 2d 36, 40 41 (D.D.C. 2006).  In this case, the government will use

authenticated e-mails to, in turn, authenticate other evidence obtained in the case.

### 2.    *Hearsay Issues*

Some of the electronic evidence exhibits (including e-mails and documents)

are not non-hearsay, because the information is not offered to prove the truth of the

matter asserted or does not meet the definition of hearsay under Fed. R. Evid.

801(c).  The statements contained in the e-mails and documents obtained from the

seized computer hard drives and Google production of records are admissible

based on (1) non-hearsay purposes; (2) party-opponent statements; and

(3) statements that satisfy an established hearsay exception.

## VI.    CONCLUSION

The government believes its case-in-chief will take approximately two

weeks, or nine trial days plus one day of jury selection, to present.  The actual time

//

//

//

//

//

//

required will be a function of the duration of defendant McTigue's cross-

examination and defense case-in-chief, if any.

DATED:  July 1, 2015 at Honolulu, Hawaii.

FLORENCE T. NAKAKUNI
United States Attorney
District of Hawaii


By: /s/ Marc A. Wallenstein
    MARC A. WALLENSTEIN
    Assistant United States Attorney
    JOHN A. MICHELICH
    Senior Litigation Counsel